# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY

**THE UNITED STATES OF AMERICA**
*ex rel.* **(UNDER SEAL)**

        **Plaintiffs,**

    **v.**

**(UNDER SEAL)**

        **Defendants.**

Civil Action No.

7:15cv60 ART

Eastern District of Kentucky
**F I L E D**

JUL 0 9 2015

AT FRANKFORT
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

## COMPLAINT FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## DO NOT ENTER IN ECF/PACER

## DO NOT PUT IN PRESS BOX

1

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**

THE UNITED STATES OF AMERICA
*ex rel.* WILLIAM R. HALL
     102 RIVERSIDE DRIVE
     WHITESBURG, KY 41858

THE UNITED STATES OF AMERICA
*ex rel.* JENNIFER HALL
     102 RIVERSIDE DRIVE
     WHITESBURG, KY 41858

     **PLAINTIFFS.**

     v.

MOUNTAIN COMPREHENSIVE
HEALTH CORPORATION
226 Medical Plaza Lane, P.O. Box 40,
Whitesburg, KY 41858

     **SERVE ON REGISTERED AGENT:**
     L.M. Caudill
     227 Medical Plaza Lane
     P.O. Box 40
     Whitesburg, KY 41858

ISOM COMMUNITY PHARMACY, INC.
93 Isom Plaza, Isom Shopping Center
P.O. Box 250
Isom, KY 41824

     **SERVE ON REGISTERED AGENT:**
     Earnest J. Watts
     105 Isom Plaza, Isom Shopping Center
     P.O. Box 250
     Isom, KY 41824

     and

Civil Action No. 7:15cv60 ART

**COMPLAINT FILED**
**IN CAMERA AND**
**UNDER SEAL**
**31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER IN**
**ECF/PACER**

**DO NOT PUT IN**
**PRESS BOX**

2

MEDICORP, INC. d/b/a PARKWAY PHARMACY
AND SUNDRIES OF WHITESBURG
2354 Highway 15
Whitesburg, KY 41858

**SERVE ON REGISTERED AGENT**
Earnest J. Watts
2354 Highway 15
Whitesburg, KY 41858

and

WHITESBURG MEDICAL CENTER
PHARMACY, INC.
2354 Highway 15
Whitesburg, KY 41858

**SERVE ON REGISTERED AGENT**
Earnest J. Watts
2354 Highway 15
Whitesburg, KY 41858

and

PUBLIC DRUG COMPANY,
INC. d/b/a BOONEVILLE DISCOUNT DRUGS
Box 1108, Highway 11 North
Booneville, KY 41314

**SERVE ON REGISTERED AGENT**
James Fred Carrico
Highway 11N,
Booneville, KY 41314

and

B&H APOTHECARY, LLC
P.O. Box 1628
Richmond, KY 40476-1628

**SERVE ON REGISTERED AGENT**
Humphrey Lowe, PLLC
1019 Majestic Drive, Suite 370
Lexington, KY 40513

and

KYVA INVESTMENT, INC., d/b/a WHITESBURG
PHARMACY
109 East Main Street
Whitesburg, KY 41858

> **SERVE ON REGISTERED AGENT**
> Dennis Wayne Fleming
> 109 East Main Street
> Whitesburg, KY 41858

JORDAN DRUG, INC. d/b/a OWSLEY
PRESCRIPTION CENTER
1075 Broadway
P.O. Box 346
Beattyville, KY 41311

> **SERVE ON REGISTERED AGENT**
> FBT LLC Lexington
> 2700 Lexington Financial Center
> Lexington, KY 40507-1742

HARLAN MEDICAL CENTER PHARMACY, INC.
132 Village Center
Harlan, KY 40831

> **SERVE ON REGISTERED AGENT**
> Earnest J. Watts
> 2534 Hwy 15
> Whitesburg, KY 41858

LB CLINIC PHARMACY
464 State Hwy 699
Cornettsville, KY 41731

> **SERVE**
> L B CLINIC PHARMACY
> 464 State Hwy 699
> Cornettsville, KY 41731

> **DEFENDANTS.**

4

## COMPLAINT FILED *IN CAMERA* AND UNDER SEAL
## PURSUANT TO 31 U.S.C. § 3730(b)(2)

**COMES NOW**, through the undersigned counsel, Relators William R. Hall and Jennifer Hall, on behalf of themselves and the United States of America ("United States), and bring this *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") and the Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b ("Anti-Kickback Statute") to recover monetary damages, civil penalties, and all other remedies for excessive reimbursements knowingly received and improperly retained by Mountain Comprehensive Health Corporation ("MCHC") and/or its agents, employees, and co-conspirators, including various contracting pharmacies named above, in violation of the Federal False Claims Act.

### INTRODUCTION

1.      This is a *qui tam* action under the FCA and the Anti-Kickback Statute to recover damages and civil penalties arising from false and/or fraudulent statements, records, and claims knowingly made and caused to be made, and to address improper referral and kickback arrangements prohibited under federal law, made and entered into between Defendants Mountain Comprehensive Health Corporation ("MCHC") and its agents, employees and co-conspirators, including the Defendant retail pharmacies ISOM Community Pharmacy, Inc., Medicorp, Inc. d/b/a Parkway Pharmacy and Sundries of Whitesburg, Whitesburg Medical Center Pharmacy, Inc., Public Drug Company, d/b/a Booneville Discount Drugs, B&H Apothecary, LLC, KYVA Investment, Inc. d/b/a Whitesburg Pharmacy, Jordan Drug, Inc. d/b/a Owsley Prescription Center, Harlan Medical Center Pharmacy, Inc. and L B Clinic Pharmacy (collectively, the "Contracting Pharmacies"), in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq. and the Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b.

5

2.      The FCA was enacted in 1863 in response to "widespread corruption and fraud in the sales of supplies and provisions to the union government during the Civil War." 132 Cong. Rec. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Glickman). Based upon substantial amendments in 1986, which were designed to enhance and modernize the government's tools for recovering losses sustained by frauds against it, the law allows and encourages a private person with knowledge of a fraud to bring an action in federal district court for himself and the United States and States and to share in any recovery. The party is known as a Relator, and the action that a Relator brings is called a *qui tam*.

3.      Each year, the Federal Government spends in excess of $1 trillion dollars on health services for people covered under the various federal healthcare plans, including (among others) Medicare, Medicaid, Tricare, and federal Workmen's Compensation programs (including the United States Department of Labor's Federal Black Lung Program).

4.      One of the largest elements of federal health care spending is the mounting cost of prescription drugs billed to or ultimately paid by the Federal government. This includes prescription drug expenses incurred directly or indirectly through the Medicare Part D program, which is used by approximately 68% of the total Medicare population.[1]

5.      To combat these rising expenditures, the Federal Government and its agents have imposed limitations on the prices healthcare providers and pharmacies dispensing these drugs can charge for them, both in the insurance plans that it directly

---

[1] *See* Centers for Medicare & Medicaid Services, Frequently Asked Questions, *available at* https://questions.cms.gov/faq.php?id=5005&faqId=12210 (last accessed on June 10, 2015)

administers and through third party agents who administer and provide services under the Medicare Part D program and other federal programs.

6.      These limitations impose a variety of conditions, but included in each governing rule and/or contract is a requirement that a third party must bill the Federal Government (directly or indirectly through Medicare Part D and other federal programs) the same price for a prescription drug than it would charge a person paying cash for that same drug, referred to generally as the "usual and customary" price. Pharmacies and healthcare providers may not charge the Federal Government, directly or indirectly, more than the "usual and customary" price for a prescription drug.

7.      In this *qui tam*, Relators allege that Defendants knowingly presented and induced false and fraudulent claims and statements in the form of inflated prescription drug charges that were material to the government's decision to reimburse payment of claims for those drugs. Defendants' scheme knowingly caused false and fraudulent statements, certifications, and claims for payment to be submitted to the United States under the Federal Payer programs for prescription drugs at fraudulently inflated prices.

8.      Defendant Mountain Comprehensive Health Corporation ("MCHC") identifies itself as a "non-profit" corporation that is "one of the largest rural health centers not only in the state of Kentucky, but also in the United States." It occupies a commanding presence in Southeastern Kentucky, boasting 27,000 patients, 5 clinic locations, and an array of contract pharmacy arrangements.

9.      As of 2014, MCHC had assets in excess of $13,500,000, and net assets in excess of $9,700,000.

10.     MCHC benefits from its designation as a covered entity under the Federal Government's 340B Drug Pricing Program. Under this program, MCHC – and any pharmacy with which it contracts, including the named Contract Pharmacies – can acquire prescription drugs at deeply discounted rates and dispense those drugs to any person who is a patient of MCHC. MCHC touts this fact as a competitive advantage in its various advertisements around Southeastern Kentucky.

11.     While there is no cap on the prices that MCHC and its contracting pharmacy partners (who are for-profit corporations) can charge for these drugs under the relevant 340B statutory provisions, the charges must comply with the general statutory and contractual provisions governing these healthcare providers concerning the prices they may charge the federal government.

12.     This Complaint concerns a fraudulent scheme identified by the *qui tam* Plaintiffs/Relators perpetrated by Defendant Mountain Comprehensive Health Corporation and its Contracting Pharmacies prescribing drugs on its behalf. Under the scheme, those pharmacies charged the Federal Government substantially more for prescription drugs dispensed to individuals participating in a federal insurance program than those same pharmacies charged to a person who paid cash. After charging the Federal Government and its agents the full price for the drug, the pharmacies would then kick-back a certain percentage of those charges to MCHC (along with paying MCHC a percentage of any cash sales, although in much smaller amounts). Upon information and belief, in various instances, the amount of the kick-back the pharmacy was willing to pay was the subject of a bidding process held by MCHC in recognition of

the substantial windfall and competitive advantages bestowed upon the Contracting Pharmacies as a result of their ability to obtain the deeply discounted drugs.

13.     The price differences at issue are substantial.  For example, MCHC's Contracting Pharmacies charged cash payors $23 for the brand name prescription drug Nexium, whereas they charged third-party payors – including Medicare Part D plans administered by various agents of the Federal Government – approximately $196 to $199 for that same prescription. MCHC then received a kick-back of approximately $105.80 from the Contracting Pharmacy based on the third-party payor charge, all for doing nothing more than permitting the Contracting Pharmacy to treat its patients through the 340B Program.  For medications regularly used by individuals insured through the Federal Black Lung program, similar discrepancies existed.  For example, MCHC and thus the Contracting pharmacies paid .16 cents for a Combivent inhaler, charged the Federal Black Lung program $133, and charged cash payors $23.[2] MCHC's kick-back for the Combivent inhaler billed to a Medicare Part D plan totaled approximately $67.

14.     MCHC and the Contracting Pharmacies fraudulent and improper practices constitute a fraud on the Federal Government and every third party agent administering plans through the Medicare Part D program, and any other insurance program that reimburses pharmacy drugs using a charge-based formula that limits reimbursement to no greater than the pharmacy's "usual and customary" charge to the cash-paying public.

---

[2] In an April 30, 2015 report from the Center for Medicare and Medicaid Services disclosed that Federal Government pays more for Nexium each year than any other drug, expending over $2.5 billion on that single drug in 2013.  *See* CMS Press Release "CMS releases prescriber-level Medicare data for first time" *available at* http://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2015-Fact-sheets-items/2015-04-30.html.

This would include, among others, the United States Department of Labor Office of Workers' Compensation Black Lung Program.

15. Every fraudulently inflated pharmacy bill or claim for payment knowingly submitted to a government prescription drug program, and every improper and impermissible kick-back and referral arrangement, violates the Federal False Claims Act ("FCA").

## JURISDICTION

16. This court possesses subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732 because Relators seek remedies on behalf of the United States for Defendants violation of 31 U.S.C. § 3729 which occurred in the Eastern District of Kentucky.

17. The complaint is filed timely within the period prescribed by 31 U.S.C. § 3731(b). There was no public disclosure of the allegations or transactions set forth in this action prior to filing under 31 U.S.C. § 3730(e).

18. This Court has personal jurisdiction over the Defendants and venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) because each Defendant can be found in, resides, transacts, or has transacted, or is qualified to do business in this District. In addition, during the period challenged by this action each Defendant regularly conducted business in this judicial district.

## PARTIES

19. Plaintiff United States of America brings this action by and through its administrative agency, the United States Department of Health and Human Services,

Centers for Medicare and Medicaid Services ("CMS"), which is responsible for the administration of the Federal health care programs, the United States Department of Labor, and any other federal agency who administers a federal program that was subject to this fraud. At all times relevant to this Complaint, the United States funded the provision of medical care for eligible patients treated by MCHC who filled prescriptions at the Contracting Pharmacies.

20.    Defendant MCHC is a non-profit organization with its principle place of business in Letcher County at 226 Medical Plaza Lane, P.O. Box 40, Whitesburg, KY 41858. MCHC identifies itself on its website as one of the largest rural health clinics in the United States, treating over 27,000 patients per year. MCHC maintains locations in Whitesburg, KY, Cornettsville, KY, Boonevill, KY, Buckhorn, KY, and Harlan, KY. Upon information and belief, each of these locations contain a pharmacy.

21.    Its most recent tax-filing shows MCHC maintains approximately $9,500,000 in net assets, with revenues in excess of $20 million per year.

22.    Defendant ISOM Community Pharmacy, Inc. ("Isom Pharmacy") is a for-profit entity and listed as a contract pharmacy for MCHC under the 340B Program since approximately September 12, 2011. Its principal place of business is in Letcher County at 93 Isom Plaza, Isom Shopping Center, PO Box 250, Isom, KY 41824, and its registered agent is Earnest J. Watts, with a registered address for service of 105 Isom Plaza, Isom Shopping Center, PO Box 250, Isom, KY 41824. Upon information and belief, Earnest J. Watts is the president, director and incorporator of Defendant Isom Pharmacy.

23.     Defendant MediCorp, Inc. d/b/a Parkway Pharmacy and Sundries of Whitesburg ("Parkway Pharmacy") is a for-profit entity and was listed as a contract entity for MCHC under the 340B program on approximately June 9, 2010. Its principal place of business is in Letcher County 2354 Highway 15, Whitesburg, KY 41858, and its registered agent is Earnest J. Watts, with a registered address for service of 2354 Highway 15, Whitesburg, KY 41858. Upon information and belief, Earnest J. Watts is the president, director and incorporator of Defendant Parkway Pharmacy.

24.     Defendant Whitesburg Medical Center Pharmacy, Inc. ("Whitesburg Medical Pharmacy") is a for-profit entity and was listed as a contract entity for MCHC under the 340B program on approximately July 1, 2013. Its principal place of business is in Letcher County at 2354 Highway 15, Whitesburg, KY 41858, and its registered agent is Earnest J. Watts, with a registered address for service at 2354 Highway 15, Whitesburg, KY 41858. Upon information and belief, Earnest J. Watts is the president, director and incorporator of Defendant Whitesburg Medical Pharmacy.

25.     Defendant Public Drug Company, Inc. d/b/a Booneville Discount Drugs ("Booneville Pharmacy") is a for-profit entity and was listed as a contract entity for MCHC under the 340B program on approximately May 10, 2012. Its principal place of business is in Owsley County at P.O. Box 1108, Highway 11 North, Booneville, KY 41314, and its registered agent is James Fred Carrico, with a registered address for service at Highway 11N, Booneville, KY 41314. Upon information and belief, Booneville Pharmacy is owned and controlled by James Fred Carrico and Matthew Todd Carrico.

26.     Defendant B&H Apothecary, LLC ("B&H Pharmacy") is a for-profit entity who was listed as a contract entity for MCHC under the 340B program on January 1,

12

2015.  Its principal place of business is in Madison County at P.O. Box 1628 Richmond, KY 40476-1628, its registered agent is Humphrey Lowe, PLLC, 1019 Majestic Drive, Suite 370, Lexington, KY 40513.  Upon information and belief, B&H Pharmacy is owned and controlled by Joe B. Hall.

27.     Defendant KYVA Investment, Inc., d/b/a Whitesburg Pharmacy ("KYVA Investment") is a for-profit entity who was listed as a contract entity for MCHC under the 340B Program on January 31, 2005.  Its principal place of business is in Letcher County at 109 East Main Street, Whitesburg, KY 41858, its registered agent is Dennis Wayne Fleming, with a registered address for service of is 109 East Main Street, Whitesburg, KY 41858.  In 2013, KYVA Pharmacy's contract with MCHC was given to Earnest Watts and his corporation, Whitesburg Medical Pharmacy.

28.     Defendant Jordan Drug. Inc. d/b/a Owsley Prescription Center ("Owsley Pharmacy) is a for-profit entity who was listed as a contract entity for MCHC under the 340B Program on January 25, 2005.  Its principal place of business is in Lee County at 1075 Broadway, P.O. Box 346, Beattyville, KY 41311, its registered agent is FBT LLC Lexington, with a registered address for service of 2700 Lexington Financial Center, Lexington, KY 40507-1742.

29.     Defendant Harlan Medical Center Pharmacy, Inc. ("Harlan Pharmacy") is a for-profit entity who was listed as a contract entity for MCHC under the 340B Program on January 3, 2005.  Its principal place of business is in Harlan County at 132 Village Center, Harlan, KY 40831, its registered agent is Earnest J. Watts, with a registered address of service of 2534 Highway 15, Whitesburg, KY 41858.

30. Defendant LB Clinic Pharmacy ("LB Pharmacy") is a for-profit entity who was listed as a contract entity for MCHC under the 340B Program on January 3, 2005. Its principal place of business is in Perry County at 464 State Highway 699, Cornettsville, KY 41731.

31. Relator William R. Hall is a licensed pharmacist working and residing in Whitesburg, Kentucky. He is the Pharmacist In Charge ("PIC") of Superior Drug, with a principle place of business at 251C Medical Plaza Ln., Whitesburg, KY 41858. By virtue of his communications with MCHC about potentially becoming a contract pharmacy under the 340B program, Mr. Hall identified MCHC's fraudulent practices and tried to raise them with MCHC's senior management. In response, MCHC promptly rejected his bid, as described below.

32. Relator Jennifer Hall is a resident of Whitesburg, KY, and was employed by KYVA Investment from 1996 through 2013. KYVA contracted with MCHC to provide 340B drugs to covered patients who obtained prescriptions at its pharmacy, and until 2013 was the pharmacy located in the MCHC Whitesburg Clinic facility. Ms. Hall was approached by Mr. Hall concerning the potential fraudulent practices, and after investigating those practices at KYVA Pharmacy, corroborated the ongoing fraudulent scheme was being perpetrating by the existing Contract Pharmacies.

33. Pursuant to 31 U.S.C. § 3730(e)(4)(B), Relators are the original source of the information provided to the United States regarding Defendants' illegal conduct in violation of Federal laws. Relators have direct and independent knowledge of the allegations set forth herein. They have notified representatives from various regulatory authorities of the wrongful actions alleged herein. In addition, they are providing a copy

of this Complaint and written disclosure of substantially all material evidence contemporaneously with this filing. The information concerning Defendants' misconduct was not disclosed publicly prior to Relators' original disclosure to the United States.

## FEDERAL REGULATIONS LIMITING PRESCRIPTION DRUG PRICES

34.     Prescription drug costs represent a significant amount of the costs on the Federal treasury, and thus the Federal Government has implemented a number of measures to contain those costs payable by government programs. Two specific cost-saving measures are relevant to this Complaint: (1) prohibitions on excessive charges, and (2) limitations on the maximum reimbursement payment by federal health care programs and entities acting as their agents, such as administrators of the Medicare Part D program.

35.     By statute, the Secretary of Health and Human Services ("HHS") is authorized to exclude from participation in any federal health care program any provider or supplier that engages in certain prohibited practices when billing Medicare or Medicaid for goods or services. Among the practices that justify exclusion of the provider are charging the government "for items or services furnished substantially in excess of such [provider's] usual charges." 42 U.S.C. § 1320a-7(b)(6). Excessive charging is treated on par with charging the government for goods or services that are not medically necessary.

36.     The exclusion for excessive charging is intended to protect the Medicare program – and the taxpayers – from medical providers and suppliers that charge the Medicare program substantially more than they charge the general public.

37.     This exclusion is consistent with the mandate of section 1156 of the Social Security Act, which requires that all providers of medical services and supplies paid for by the federal government, including pharmacies that provide drugs paid for by the federal government, must provide those items "economically". 42 U.S.C. § 1320c-(5)(a)(1). A pharmacy that charges the government a price for prescription drugs that is substantially higher than the pharmacy's price to the general public does not provide the drugs "economically" to the government.

38.     Every time MCHC or one of its Contract Pharmacies submits a claim to a Plan in which it seeks reimbursement for a prescription at a price that is substantially inflated over the price it charges self-paying customers for the exact-same drug, it violates its duty to provide the prescription economically and constitutes a fraud.

39.     In addition to these general provisions, various federal laws and contractual provisions limit the maximum reimbursement rate that the government will pay for covered drugs.

40.     Although the reimbursement formulas vary depending upon the program, most programs – including plans governing Medicare Part D prescription drug benefits – limit reimbursement for payments for pharmacy drugs to the pharmacy's usual and customary price for the drugs.  This cap is sometimes expressed by other phrases, such as the "usual price" or the "price to the general public."  Examples of programs that cap drug reimbursement at the pharmacy's usual and customary price are the Medicare Part D Program, the Public Health Services Program, and federal worker's compensation programs (including the Department of Labor's Black Lung program), among others. These programs are discussed below where relevant.

## 1. **Medicare Overcharges**

41.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42.

U.S.C. § 1395 et seq., known as the Medicare program.  Medicare is a health financing

program that pays for the costs of certain services and care provided to eligible aged

and disabled beneficiaries.  Entitlement to Medicare is based on age, disability, or

affliction with end-state renal disease.

42.     The Department of Health and Human Services ("HHS") is responsible for

the reimbursement, administration and supervision of the Medicare Program.  The

Centers for Medicare & Medicaid Services ("CMS") is a component of HHS and is

directly responsible for the administration of the Medicare program.  The rules

governing the Medicare Program are set forth in the statute (the "Medicare Act"),

regulations, and the manuals, rulings and other policy statements issued by CMS,

including but not limited to the Provider Reimbursement Manual ("PRM") and the CMS

Online Manual System ("MS"). Medicare is permitted to pay only for expenses that are

"reasonable and necessary for the diagnosis and treatment of illness or injury . . . ." 42

U.S.C. § 1395y(a)(1)(A).

43.     The Medicare Prescription Drug Improvement and Modernization Act of

2003 added prescription drug benefits to the Medicare program under Part D.  Medicare

Part D was implemented in January 2006.  Since that date, the Medicare Program has

provided subsidized drug coverage for all Medicare Part D enrollees (also known as

"beneficiaries" or "members").  The Federal government each year pays approximately

75-80 percent of the cost of providing covered drugs to Medicare Part D enrollees.

17

44.     The United States does not pay pharmacies directly for providing covered drugs to enrollees. Rather, the United States pays Part D Plan Sponsors. Plan Sponsors are typically private insurance companies such as Humana and Anthem. Any inflated charges to the Medicare Part D program through inflated charges to Plan Sponsors' are ultimately paid by the United States Treasury.

45.     Many Plan Sponsors contract with third parties known as pharmacy benefit managers ("PBMs") that act on Plan Sponsors' behalf. PBMs typically administer plan operations on behalf of the Plan Sponsors, including the payment of claims to pharmacies and the submission of costs data to the government. The relationship between the Plan Sponsor and the PBM is governed by the contract between those entities. PBM-Plan Sponsor contracts often permit the PBM to pass through a pharmacy's charges to the Plan Sponsor. In those circumstances, charges to a PBM for drugs dispensed to Medicare Part D beneficiaries are directly passed through to the Plan Sponsors.

46.     Plans (or their PBMs) typically negotiate directly with the pharmacy regarding the prices they will charge for prescription drugs provided to Plans' beneficiaries. Upon information and belief, Plan Sponsors and/or PBMs that negotiated agreements with the Contract Pharmacies and/or MCHC contained a provision that they could not charge higher than their usual and customary price to the cash-paying public when submitting a claim for reimbursement.

47.     In addition to these provisions, federal regulations and guidelines governing Medicare Part D incorporate this requirement. If a pharmacy offers a price to its cash customers throughout the year that is even lower than the price it has

18

negotiated with a Plan, that lower price is considered the usual and customary price, and the Plan reimburses the pharmacy on the basis of that lower price, even if the Plan's contract with the pharmacy would allow for a higher price. *See* Medicare Manual at Ch. 14, Section 50.4.2.

48.     For in-network pharmacies, Section 1156 requires those pharmacies to provide the drugs "economically," and thus the negotiated in-network prices that pharmacies charge Plans cannot exceed the "usual and customary prices" the pharmacies charge customers who self-pay.

49.     Medicare Part D also requires that pharmacies that dispense drugs covered by Part D must advise beneficiaries of any price differential between the price of the drug to the enrollee and the price of the lowest-priced equivalent generic available at the pharmacy.  Medicare Modernization Act § 18600-4(k)(l), 42 U.S.C. 1395w-l04(k(1).  A Part D beneficiary's purchase at a lower cash price must be reported as the "true out of pocket cost" for that purchase rather than the higher negotiated price.

50.     MCHC and/or the Contract Pharmacies' submission of Medicare Part D claims for reimbursement to a Part D Plan Sponsor or PBM acting on behalf of a Plan Sponsor is the equivalent of submitting the claim to the United States, since Plan Sponsors and PBMs act as the agents of the United States in reimbursing Part D claims with federal funds.

51.     When MCHC and/or the Contract Pharmacies submitted inflated and false claims to a Plan D Sponsor or PBM acting on its behalf, this caused the submission of false claims to the United States (CMS) in the form of records concerning their prescription drug reimbursement.

52.     In the records required to be submitted to CMS, each Plan Sponsor (or the sponsor's PBM if the PBM submitted such records to CMS on the Sponsor's behalf) is required to submit a certification to CMS based on its best knowledge, information and belief that its submissions are "accurate, complete and truthful." 42 C.F.R. §423505(k)(3). Medicare Manual, ch. 9, Section 80.1, p. 67.

53.     The regulations also require every contract between a Part D plan (or PBM) and a downstream entity (such as MCHC and the Contract Pharmacies) to specify that any downstream entity also "comply with all applicable Federal laws, regulations, and CMS instructions." 42 C.F.R. § 423.505(i)(3)(v). Federal regulations governing Medicare Part D program define a pharmacy that provides prescription drugs as a "downstream entity." *See* 42 C.F.R. § 423.501.

54.     When MCHC and/or the Contract Pharmacies submitted inflated claims for reimbursement for covered drugs to Plans and PBMs, they did not comply with all applicable Federal laws, regulations and CMS instructions. MCHC and the Contract Pharmacies' conduct alleged in this Complaint thus caused Plan Sponsors (and the Sponsor's PBMs) to falsely certify that the records for drugs submitted to CMS were accurate, complete and truthful.

55.     These inflated prescription charges caused the Federal Government to pay the Plan Sponsors inflated and higher costs for prescription drug services than they would without the inflated charges.

56.     Medicare payments to Part D Plans are based on bids submitted by Plan Sponsors to the United States government, through CMS. The bids set forth the plan's projected annual costs to provide Part D benefits that year, and are subject to

20

negotiations between the Plan Sponsor and CMS. Once a bid is accepted and a contract is awarded, CMS makes interim or "prospective" payments called Direct Subsidy payments to each Plan Sponsor each month throughout the coverage year based on the Plan's projected costs.

57.     As a condition of the Direct Subsidy payment, CMS requires that no later than 30 days after the date of service or the date of payment of each Part D claim, whichever is later, a Plan Sponsor or PBM acting on the Plan Sponsor's behalf must electronically transmit to CMS, through the Drug Data Processing System, a Prescription Drug Event ("PDE") record that is comprised of some, but not all, fields of information contained in the pharmacies' claim form. PDE records include the enrollee's name, the drug prescribed, and the amounts paid by the Plan and enrollee.

58.     In addition, after the close of a plan's fiscal year, the Plan Sponsor or PBM acting on the Plan Sponsor's behalf, must submit to CMS a Direct and Indirect Remuneration ("DIR") Report. The DIR Report discloses any money or other remuneration the Plan received from the PBM or others (such as drug manufacturers) which is attributable to the covered drugs dispensed to Plan enrollees; such remuneration effectively reduces the amounts the Plan paid for the drugs.

59.     CMS uses the accumulated PDE records, along with the DIR report, to determine the costs the Plan incurred in providing covered drugs to Plan enrollees. Those final cost figures are then used to determine whether the United States Government owes the plan additional money beyond interim payments previously made for providing covered drugs to Part D enrollees during the preceding fiscal year, or

21

whether the Plan owes the government money.  Accordingly, inflated prescription drug charges are often directly incurred by the United States Government.

60.     Upon information and belief, the fraudulent prescription drug charges at issue in this Complaint caused foreseeable injury to the United States in connection with the Medicare Part D payment process in the following regards:

- First, they caused the Federal Government to pay nearly 100% of claims for individuals who reached the donut hole faster due to the inflated drug prices and caused the government to pay more of each post-donut hole bill than it otherwise would have paid;

- Second, under the Low-Income Cost-Sharing Subsidy program, the federal government begins paying nearly 100% of prescription drugs for certain low-income Medicare beneficiaries even earlier – once they reach the start of the donut hole.  *See* 42 C.F.R. § 423.329(a)(3); 42 C.F.R. § 423.782

- Third, under the government's risk-sharing subsidy program, if a Plan Sponsor exceeds its expected aggregate annual pharmacy costs by a certain percentage, CMS must subsidize part of the excess; if the Plan is below its expected aggregate costs by a certain percentage, it must reimburse CMS.  42 C.F.R. §§ 423.315(e), 423.336.  MCHC's inflated claims caused the government to pay a portion of these inflated charges (or to lose reimbursement to which it is entitled).

- Fourth, under the government's reinsurance subsidy program, if any individual beneficiary's annual pharmacy costs exceed expectations by

22

a certain percentage, the government must also subsidize part of the excess. 42 C.F.R. §§ 423.329(c), 423.315(c). MCHC's inflated claims caused the Plans to get the government to pay a portion of these charges as well.

- Fifth, the government bases its contracts with Plan Sponsors on a national bid. 42 C.F.R. § 423.279. When Plan Sponsors submitted inflated PDEs reflecting MCHC's inflated billings, those amounts were factored into the next year's bids and caused the government to pay an inflated fee in that coming year.

61.     In addition, this fraud harms all patients insured through the Federal Government. Because the "donut hole" in Part D coverage (the amount between $2,960 and $4,700 in prescription drug costs for which beneficiaries receive no coverage currently)[3] is determined by the amount of prescription drug reimbursements, beneficiaries who purchase drugs at the inflated prices are pushed into the donut hole much more rapidly than they should be. For example, a Part D beneficiary who is charged $196 for Nexium is going to reach the donut hole faster than someone who is charged $23 for that prescription. Moreover, once the patient reaches the donut hole and exhausts those benefits, the Federal government then pays nearly 100% of the remaining drug costs that year (known as "catastrophic costs"). 42 C.F.R. § 423.104(d).

## 2. Public Health

62.     The United States Public Health Service provides funds for a number of entities that offer health services to the poor and underprivileged (including, for

---

[3] This is accurate for the FYE 2015. Under 42 C.F.R. § 423.104(d)(5)(iv), the coverage limits have changed each year.

example, public housing, health centers, disproportionate share hospitals, black lung

clinics, and AIDS clinics). Federal regulations require that the maximum amount that

Public Health entities can expend from program funds for the acquisition of drugs shall

be the lowest of, among other things, the provider's "usual and customary charge to the

public for the drug." 42 C.F.R. § 50.504.

63. Billing practices that inflate pharmacy bills above the pharmacies' usual

and customary charge defraud Public Health Service entities when the usual and

customary charge is lower than alternative charges in the statutory reimbursement

formula.

### 3. **Federal Workers' Compensation Programs**

64. The Office of Workers' Compensation Programs ("OWCP") of the U.S.

Department of Labor ("DOL") administers federal workers' compensation programs

under four statutes: (I) the Federal Employees' Compensation ("FECA"), 5 U.S.C. §§

8101 et seq., (2) the Longshore and Harbor Workers Compensation Act (LHWCA), 33

U.S.C. §§ 901 et seq., (3) the Federal Black Lung Benefits Act ("FBLBA), 30 U.S.C. §§

901 et seq., and (4) the Energy Employees Occupation Illness Compensation Program

Act ("EEOIC"), 42 U.S.C. §§ 7384 et seq.

65. These programs, like their Medicare counterpart, require providers to

charge the lower of their "lowest fee to the general public", and contain other similar

language consistent with the obligations of the "usual and customary price" prohibitions.

See, e.g., OWCP Medical Fee Schedule 2011, U.S. Department of Labor, Office of

Worker's Compensation Programs, July 10, 2011, available at

http://www.dol.gov/owcp/regs/feeschedule/fee/fee11/READ_ME_FIRST_fs11_instructio ns.htm.

## THE 340B DRUG PRICING PROGRAM

66.     The 340B Drug Pricing Program (as defined below) was established by Congress in 1992 as a way to provide discounts on outpatient drugs to select "safety net" providers that serve the neediest citizens.

67.     Section 340B of the Public Health Services Act, 42 U.S.C.A. § 256b (Oct. 2010 Supp.), imposes ceilings on prices drug manufacturers may charge for medications sold to specified health care facilities (the "340B Program"). Under the original 340B statute, covered entities were generally disproportionate share hospitals— hospitals that serve indigent populations. See id. § 256b(a)(4)(L). However, as part of the Patient Protection and Affordable Care Act ("ACA"), Congress added several categories to the covered entities list that became (M), (N), and (O) under 42 U.S.C. § 256b(a)(4), including (among others) children's hospitals excluded from the Medicare prospective payment system, free-standing cancer hospitals excluded from the Medicare prospective payment system, critical access hospitals, rural referral centers, and sole community hospitals. See Pub. L. 111-148 § 7101(a) (March 23, 2010), codified at 42 U.S.C. § 256b(a)(4)(M)-(O).

68.     In April 2010, Congress saw fit to expand the 340B Drug Pricing Program to expand the scope of covered entities and to permit *all* covered entities to enter into contract pharmacy arrangements with non-covered entities to permit them to dispense drugs on behalf of covered entities to covered patients, regardless of whether they had an in-house pharmacy.

69.     Since the 2010 amendments and regulatory changes, these contract pharmacy arrangements have grown exponentially. The number of unique pharmacies that have qualified as a 340B covered entity has grown 770 percent, and the total number of contract pharmacy arrangements has grown by 1,245 percent. *See* OIG Memorandum Report: *Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431.

70.     Under the 340B program, drugs that were purchased pursuant to the reduced pricing scheme can be dispensed to any patient of the covered entity, pursuant to any exceptions or exclusions contained in the regulations.

71.     The 340B Drug Pricing Program is superintended by the Health Resources and Services Administration (HRSA), a unit of the Department of Health and Human Services (HHS).

72.     340B does not impose specific limits on the price that a provider may charge for a specific drug, nor does it provide an exclusion to the general provisions governing prescription drug pricing outlined in this Complaint and incorporated herein by reference. Accordingly, providers are still bound by the standard claim reimbursement limitations outlined in the various Federal statutes and applicable rules, contracts and regulations, and the specific provisions outlined therein concerning submission of prices for claims for eligible 340B outpatient drugs.

73.     While the 340B program is supposed to provide some benefit to the 340B covered entities – i.e. the difference between the usual price for the drug and the 340B drug price – it is not intended to provide an improper windfall to those entities at the expense of the government (and thus taxpayers) and other third-party providers.

## THE FALSE CLAIMS ACT

74.    The False Claims Act ("FCA") provides, in pertinent part that:

> (a) Any person who (1) (A) knowingly presents, or causes to be presented . . . a false or fraudulent claim for payment or approval; (B) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; ... or (C) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,... is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 plus 3 times the amount of damages which the Government sustains because the act of the person.;
>
> (b) For purposes of this section,(1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information, and (B) no proof of specific intent to defraud is required.

False Claims Act, 31 U.S.C. § 3729.

75.    The term "claim" is defined to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the

money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

76.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

77.     The FCA above reflects the statute as further amended by the Fraud Enforcement Recovery Act ("FERA") passed by Congress and signed into law on May 20, 2009 for the express purpose of strengthening the tools available to combat fraud and to overturn the judicial decisions that had weakened the False Claims Act.  Pub. L. No. 111-21, 123 Stat. 1617 (2009).  The Amendments apply to all claims arising after May 20, 2009.  The prior version of the statute applies to any claims prior to May 20, 2009.

78.     The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to enable the United States (a) to conduct its own investigation without the defendant's knowledge, and (b) to determine whether to join the action.

79.     Based on these provisions, qui tam relators William Hall and Jennifer Hall seek to recover all available damages, civil penalties and other relief for federal and state violations alleged herein.

## THE ANTI-KICKBACK STATUTE

80.     The Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b(b) ("Anti-Kickback Statute"), provides criminal penalties of no more than $25,000 or five years in jail or both for the following:

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind— (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . . (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program * * *

(2) whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person— (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. (B) to purchase, lease, order, or arrange for or recommend purchasing purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b).

81.    A "federal health care program" is defined at 42 U.S.C. § 1320a-7b(f) as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government. The statute applies to the performance of medical procedures. It requires that the professional judgment of the provider, and not financial considerations, guide the decision to perform medical procedures.

82.    Federal regulations identify narrow "safe harbors" that do not violate the Anti-Kickback Statute.  Upon information and belief, no safe harbor applies to the conduct alleged herein.

83.    The Patient Protection and Affordability Care Act ("PPACA"), Pub. L. No. 111-148, 124 Stat. 119 (H.R. 3590), which was signed into law on March 23, 2010, specifically makes a violation of the Anti-Kickback Statute actionable under the FCA. PPACA amended the Anti-Kickback Statute to provide that a "claim that includes items or services resulting from a violation [of the Anti-Kickback Statute] constitutes a false or

fraudulent claim" under FCA. H.R. 3590, § 6402(f)(1). Moreover, it also clarified that actual knowledge of the Anti-Kickback Statute or specific intent to commit an Anti-Kickback Statute violation is not required for liability. H.R. 3590, § 6402(f)(2).

84. Compliance with the Anti-Kickback Statute is a precondition to participation in the Federal Payer Programs and to receive payment from the United States under Medicare pursuant to 42 C.F.R. § 413.24(f)(4)(iv). For example, providers certify on CMS 855A when enrolling in Medicare that they "agree to abide by Medicare laws, regulations and program instructions that apply to me. . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute), and on my compliance with all application conditions of participation in Medicare." Therefore, by seeking payment from the United States, healthcare providers certify their compliance with the Anti-Kickback Statute, and the failure to comply renders the provider ineligible for payment.

85. Upon information and belief, the State of Kentucky has enacted anti-kickback statutes, KRS 216.2950 the provisions of which are substantially similar to those of the Anti-Kickback Statute. To the extent available by law, Relators assert claims under these anti-kickback laws as well.

## THE FRAUDULENT SCHEME

86. At all times relevant to this Complaint, MCHC and the Contract Pharmacies provided care and prescription medications to patients for which they directly or indirectly billed the Federal Government.

30

87.     At all relevant times, upon information and belief, MCHC and/or the
Contract Pharmacies were under signed contracts with the federal government
programs and their agents (such as PBMS and Plan Sponsors) and were authorized
providers of services to patients insured by Medicare and other federally funded
programs.  All of these federally funded programs are collectively referred to hereinafter
as "Federal Insurers."

88.     In or about November 2012, Relator William R. Hall, as PIC of Superior
Drug, received a "Bid Proposal Worksheet" from MCHC to enter into a potential contract
pharmacy relationship with MCHC for a location in Whitesburg, KY.  That worksheet
contained a chart outlining the potential fees that a contracting pharmacy could earn if
its bid to participate as the contracting pharmacy at MCHC's Whitesburg Clinic location
was accepted, and sought pharmacies to "bid" by identifying the level of kick-back they
would provide to MCHC if they were selected by MCHC as the Contract Pharmacy.  A
copy of the worksheet is attached as Exhibit 1.

89.     The worksheet contained a breakdown of two different scenarios –
patients paying with cash and patients paying with third-party insurance coverage for
the same drug.   For patient 1, an insurance patient, the pharmacy would pay
approximately $5 for a covered 340B drug, receive approximately $45 from third party
insurance and $10 from the patient, and have a total retail price of approximately $55.
From that, the pharmacy would deduct its dispensing fee, the pharmacy's cost (any
additional administrative fee it would proposed to add), and determine its net profit.  It
would then be permitted to present a bid for how much of its profit it would be willing to
pay to MCHC for each covered drug it dispensed to a covered patient.  *See* Exhibit 1.

31

90.     For patient 2, a cash patient, it indicated that the total retail price for that cash patient for the exact same drug in the exact same quantity would be only $10, a nearly $45 discrepancy between the cash price and the third-party payor price. *See* Exhibit 1.

91.     Recognizing the potential fraudulent and inappropriate conduct, Mr. Hall reached out to MCHC concerning the issue on or about November 29, 2012. An MCHC representative told him to ignore his concerns.

92.     On or about December 3, 2012, Mr. Hall submitted his "bid" worksheet. In the worksheet, Mr. Hall noted that "On the insurance lines because of the usual and customary fee clause and since no special contracts have been presented the figures for the insurance lines could be considered illegal fraud and/or grounds for contract termination." (emphasis added). *See* Exhibit 2.

93.     Following the submission of Mr. Hall's information, Mr. Hall again reached out to the president of MCHC, L.M. Caudill, on or about December 12, 2012 to report his concerns.

94.     After receiving Mr. Hall's worksheet and learning of his concerns, MCHC never responded to any of Mr. Hall's inquiries or attempted to explain their discrepancy. Instead, on or about December 27, 2012, Mr. Hall received a curt reply from Phillip Hampton, COO of MCHC:

Dear Mr. Hall,

**The bid Mountain Comprehensive Health Corporation received on December 3, 2012 for Pharmacy services in our Whitesburg Clinic location has been rejected.**

Thank you for your bid for these services.

32

Exhibit 3 (emphasis added)

95.     The contract for that location was awarded to Earnest J. Watts, who owns and controls four (if not more) contract pharmacies associated with MCHC.  Upon information and belief, Mr. Watts, as well as every other Contract Pharmacy, is well aware of the pricing differential being charged to cash and insurance customers and participates in the illegal kick-back scheme with MCHC.

96.     Based on his concerns, Mr. Hall worked with his wife Relator Jennifer Hall, who was employed by KYVA Investments to see if MCHC was incorporating these fraudulent practices into their business with their existing Contract Pharmacies.

97.     Additional information obtained by Mr. Hall from Mrs. Hall confirms the fraudulent conduct that occurred and may be continuing to occur at MCHC and within the Contract Pharmacies.  Excel spreadsheets that were submitted as part of a monthly report from KYVA Investments' Administrator to MCHC – and are believed to be submitted by all other Contract Pharmacies – established that MCHC was doing exactly what Mr. Hall suspected: charging Medicare and other federal payors roughly 2000% more than what MCHC was charging cash patients.  *See* Exhibit 4.

98.     For example, upon information and belief, in or around November 2012, MCHC (and thus its Contract Pharmacies) paid $0.31 for 30 40MG Nexium capsules. The Contract Pharmacies charged a cash-paying customer $23.00 for those pills, but simultaneously charged third-party payors between $196 and $199 for that exact same prescription.  Other examples abound.   *See* Exhibit 4.

99.     Upon information and belief, Defendant MCHC and its Contract Pharmacies had a practice of marking up drugs acquired at deep discounts pursuant to

33

the 340B program and then significantly overbilling the government. The effect of this was that they overcharged the Federal Government hundreds of thousands of dollars to millions of dollars (or more) for these drugs.

100. In addition, these spreadsheets indicated just how large of a kickback the Contract Pharmacies were paying MCHC for the opportunity to be able to access the deeply-discounted 340B drugs and MCHC patient population. For a single Nexium prescription, MCHC received a kickback of $105, despite only paying $.31 for the medication and having the Contract Pharmacy handle the sale.

101. These ill-gotten gains have likely assisted MCHC in developing nearly $10 million in net assets as reflected on its most recent tax filings, and offered financial remuneration to the various Contract Pharmacies that were involved in or received funds from these inflated prices. While the for-profit Contract Pharmacies have not disclosed their financial performance, based on the sheer volume of prescription drug use in the area and level of profit from these improper referral and kickback schemes, and fraudulent pricing submissions, the amount at issue is significant.

## COUNT I: VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. §§ 3729

102. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 101 above as though fully set forth herein.

103. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

104. By virtue of the acts described above, MCHC and the Contract Pharmacies knowingly presented or caused to be presented false or fraudulent claims to officers, employees or agents of the United States Government for payment or

approval under Medicare, the United States Department of Labor Workers Compensation Programs (including the Black Lung program) and other government health care programs, within the meaning of 31 U.S.C. § 3279(a)(1)(A) (and as previously enacted, 31 U.S.C. § 3729(a)(1)). Defendants knew these claims were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

105. By virtue of the acts described above, MCHC and the Contract Pharmacies knowingly made or caused to be made or used false of fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved under Medicare, the United States Department of Labor Workers Compensation Programs (including the Black Lung program) and various other government health care programs, within the meaning of 31 U.S.C. § 3729(a)(1)(B) (and as previously enacted 31 U.S.C. § 3729(a)(2)). Defendants knew these claims were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

106. By virtue of the acts described above, MCHC and the Contract Pharmacies knowingly made, used or caused to be made or used false records and statements to conceal, avoid or decrease an obligation to pay money to the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G) (and as previously enacted 31 U.SC. § 3729 (a)(7)). Defendants knew these claims were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

107. Each claim presented or caused to be presented for reimbursement for an inflated prescription drug charge under the scheme described herein represents a false or fraudulent claim for payment.

108. The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, and unaware of Defendants' fraudulent scheme, paid and continues to pay claims that would not be paid but for defendant's unlawful conduct. These claims would not have been paid but for Defendants' fraud and false statements.

109. By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

110. Additionally, the United States is entitled to the maximum penalty permitted by law for each and every false and fraudulent claim made or caused to be made by defendant arising from their unlawful conduct as described herein.

## VIOLATIONS OF THE ANTI-KICKBACK STATUTE
## 42 U.S.C. § 1320a-7b

111. Relators restate and reallege the allegations contained in paragraphs 1-108 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

112. The Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b, provides criminal penalties up to $25,000 or five years in jail or both for the following:

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind— (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health

care program, or (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program * * *

(2) whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person— (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b).

113.    Each claim for reimbursement for fraudulently inflated prescription drug charges represents a false or fraudulent claim for payment because each prescription for which the pharmacy sought reimbursement carried with it a false certification by Defendants that the service it provided complied with the Anti-Kickback Statute.

114.    Defendant Contract Pharmacies have violated the Anti-Kickback Statute offering and knowingly and willfully providing and/or receiving a direct and substantial financial incentive in the form of kickbacks to induce Defendant MCHC to retain them as a contract pharmacy, thereby providing them with a financial windfall.

115.    These kickbacks were received by and with the knowledge of healthcare providers, including the Contract Pharmacies and MCHC.  Upon information and belief, no safe harbor provisions apply.

116.    Defendant Contract Pharmacies and Defendant MCHC have violated the Anti-Kickback Statute by knowingly and willfully soliciting and/or receiving a direct and substantial financial incentive in the form of kickbacks to them to refer patients to their

Contract Pharmacies for refills of prescription drugs. Upon information and belief, no safe harbor provisions apply.

117.    Unaware of the Defendants' violation of the Anti-Kickback Statute and the falsity of the records, statements, and claims made or caused to be made by Defendants, the United States paid and continues to pay on the claims that would not be paid but for Defendants' wrongful actions and omissions.

118.    As violations of the Anti-Kickback Statute, the material misrepresentations made by Defendants to induce the unnecessary use of the devices constitute false claims and statements under 31 U.S.C. § 3729 et seq.

## PRAYER FOR RELIEF

WHEREFOR, Relators pray for judgment against each defendant jointly and severally as follows:

1.    That defendants cease and desist from violating 31 U.S.C. § 3729 et seq. (the False Claims Act) and 42 U.S.C. § 1320a-7b (the Anti-Kickback Statute);

2.    That this Court enter judgment against each defendant in an amount equal to three times the amount of damages the United States has sustained because of defendant's actions, plus a civil penalty of not less than $5,000 and not more than the maximum amount permitted for each violation of 31 U.S.C. § 3729;

3.    That Relators be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

4.    That Relators be awarded all costs of this action, including attorneys' fees and expenses; and

5. That Relators recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

July 9, 2015

By:   /s/ Anthony P. Ellis

Tyler S. Thompson
DOLT, THOMPSON, SHEPHERD & KINNEY
13800 Lake Point Circle
Louisville, KY 40223
(502) 410-3809
(502) 244-7776 FAX

B. Todd Thompson
Anthony P. Ellis
THOMPSON & ELLIS, PLC
734 W. Main, Suite 200
Louisville, KY 40202
(502) 753-1800

*Counsel for Plaintiffs*

## CERTIFICATION

I certify that the foregoing Complaint was hand delivered and filed under seal with

the United States District Court Clerk on July 9, 2015 pursuant to 31 U.S.C. § 3730 et

seq.

ANTHONY P. ELLIS